SO ORDERED.

SIGNED this 11th day of December, 2013.





_____
Robert E. Nugent
United States Chief Bankruptcy Judge
_____

OPINION DESIGNATED FOR ONLINE PUBLICATION
BUT NOT PRINT PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | Jointly Administered |
| | ) | |
| WK LANG HOLDINGS, LLC, | ) | Case No. 13-11934 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |

### ORDER ON DEBTORS' AMENDED MOTION FOR SALE NO. 1

Chapter 11 debtors in possession may exercise a trustee's power to sell assets free and clear of liens under § 363(b) and (f). Even when a sale is proposed outside the plan process and includes all or a substantially portion of the debtor's assets, the bankruptcy court may approve it under subsection (b) as long as it meets certain benchmarks. The sale must (1) be based on sound business reasons; (2) be adequately noticed to interested parties with full disclosure both of the sale terms and the debtor's

relationship with the buyer; (3) be for a fair and reasonable price; and (4) be in good faith. In the Tenth Circuit, the price is reasonable if the sale will yield 75% of the fair market value of the assets sold. Case law in many circuits also suggests that a sale by the debtor to an insider of the debtor is not in bad faith, per se, so long as there is no fraud, collusion or unfair advantage.[1] To sell the assets free and clear of interests in the property, the court must find that the sale satisfies one of the five conditions enumerated in § 363(f). Here, the debtors submit that (f)(3) and (f)(5) are satisfied.

Debtors WK Lang Holdings, L.L.C., Hardwood Millwork and Supply, L.L.C., Hardwood Manufacturing, L.L.C., and Hardwood Cabinets, L.L.C. filed their amended motion to sell assets free and clear of liens to HWM, Inc. on November 15, 2013.[2] Under the proposed agreement, HWM will acquire certain real estate, some vehicles, accounts, inventory, general intangibles, and a line of woodworking equipment. HWM is a new entity owned and organized by one of the current owners of the debtors, the Lang living trust. Current creditor First Bank of Newton proposes to finance this purchase. Midland Bank, the secured creditor that holds a lien on the equipment, objects that the sale price is not fair and reasonable and that the sale is not in good faith. After hearing evidence concerning the structure of the debtors, the proposed

---

[1] *See In re Medical Software Solutions*, 286 B.R. 431, 445 (Bankr. D. Utah 2002) (citing *In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830, 842 (Bankr. C.D. Cal. 1991)); *see also In re Condere Corp.*, 228 B.R. 615, 632 (Bankr. S.D. Miss. 1998) (Where debtor and purchaser share the same management the proposed sale would be subjected to heightened scrutiny.).

[2] Dkt. 96, amending dkt. 75.

transaction, and the value of the property to be sold, I conclude that the sale complies with § 363 and, as orally modified at the hearing, may be approved.

### *Facts*

The debtors in these jointly-administered cases have interlocking ownership and management. WK Lang Holdings, LLC (WKL) owns Hardwood Manufacturing (Manufacturing) and Hardwood Cabinets (Cabinets).[3] Manufacturing owns Hardwood Millwork and Supply (Millwork), the operating entity. The Steve C. Lang Revocable Trust, Melinda Lang Revocable Trust, and Steven C. Lang Irrevocable Trust No. 2 each own a third of the interest in WKL. The Lang family has been in the custom hardwood millwork and cabinet business in Burrton, Kansas since 1988, specializing in millwork and cabinetry for homes selling for not less than $300,000.  Ninety percent of their business is in new home construction. At one time, the business had as many as 135 workers, but now employs 25. Manufacturing holds all the assets, pays overhead, and manages payroll for the various other debtors. Cabinets is a regional maker and seller of custom cabinetry. Manufacturing, through its operating subsidiary Millwork, makes hardwood trim and moldings and engages in other millwork that is sold locally and regionally. When the economy faltered in 2008 and 2009, Cabinet lost over 75% of its sales in a 45-day period.[4]  Steve Lang is the managing member and chief executive

---

[3] WKL formerly owned an interest in a third affiliated entity McKinley Hardwoods, LLC located in Oklahoma City but McKinley was sold to the minority interest holder Mike McKinley in 2010.

[4] Cabinets was a stand alone manufacturer of cabinets but ceased business operations in 2011 and only minor amounts of equipment and inventory remain

Case 13-11934    Doc# 115    Filed 12/11/13    Page 3 of 23

officer who makes the debtors' business decisions. The business is currently operated at 202 East Dean in Burrton.

Midland National Bank holds a variety of claims against the debtors. Other banks, including Kanza Bank, signed participation agreements with Midland and under those agreements, one lender, Kanza Bank, could assert control of the credits and act as lead lender if it became dissatisfied with Midland's servicing efforts. Midland's claims filed in this case that are affected by the proposed sale are:

Note ***89 dated November 1, 2007 with a remaining balance of $830,300.89.

Note ***73 dated November 1, 2007, with a remaining balance of $761,262.38,

All four Lang companies co-made notes 73 and 89 and cross guaranteed them. Those two notes are secured by real estate mortgages covering land commonly described as 302 E. Dean (the former Cabinet location that was sold in 2011), 110 N. Reno, and 115 N. Reno, all in Burrton. Those two notes are also secured by a security interest in all of the debtors' machinery and equipment. The mortgages and liens are perfected. In addition to the security held by Midland, the United States Department of Agriculture Rural Development Service has guaranteed repayment of up to 75% of the unsecured portion of these two notes.[5] Midland's president indicated that these USDA guaranties are provided through the Business and Industry Loan Program. They are similar to SBA (Small Business Administration) guaranties. The USDA

_____

after an online auction of assets was held.

[5] Ex. S and T.

-4-

guaranty comes with a variety of conditions, three of which are that the full amount of debt must be obtained before it will consent to the release of collateral, USDA must approve all modifications to guaranteed loans, and any sales of collateral must be for a proper business purpose.[6]

Midland also holds other notes of the various debtors as follows:

WKL Note ***78 dated January 18, 2011, with a remaining balance of $153,034.

WKL Note ***86, dated January 18, 2011, with a remaining balance of $711,583.

Millwork Note ***70 dated January 18, 2011, with a remaining balance of $148,246.

Millwork Note ***74 dated January 15, 2012, with a remaining balance of $621,749.

Millwork and Cabinet have guaranteed repayment of Notes 78 and 86. Millwork and WKL have guaranteed Notes 70 and 74. Each of these notes is also secured by the above-referenced security interests in the companies' machinery and equipment as well as mortgages on the real property, cross-guaranties among the companies, and personal guaranties of Mr. and Mrs. Lang. These notes are not, however, backed by the USDA guaranties.

In addition to these debts and claims, several of the debtors owe the First Bank of Newton on the following obligations:

---

[6] *See also* Ex. U, providing that USDA's policy is to "not allow debt write-down/adjustments and leave the same principals in charge of the business."

Cabinet Note *4299, dated January 12, 2011 with a remaining balance of $187,837.33.

Note *2423, dated April 7, 2011 with a remaining balance of $1,150,890.79.

Mr. and Mrs. Lang co-signed the Cabinet note and are the makers of Note *2423. These notes are secured by Cabinet's inventory, accounts, and general intangibles, along with a series of real estate mortgages that encumber farm ground owned by the Langs as well as the company's current manufacturing facility located at 202 East Dean in Burrton, whose construction First Bank originally financed in 2004.

As part of the proposed Sale No. 1,[7] debtors offer to sell 202 East Dean and the personal property collateral to the new Lang entity HWM in exchange for HWM assuming the First Bank real estate mortgages of $1.15 million on East Dean and payment of $725,000 cash for accounts receivable and inventory. The Steve C. Lang Revocable Trust owns the equity in HWM; he is the president and sole director of HWM. Charity Bowman, the debtors' chief financial officer, is the secretary/treasurer of HWM.[8] The original Notice of Sale provided for the debtors to also sell Millwork's machinery and equipment to the new entity for $350,000 cash. As orally amended at trial, that offer has increased to $410,000 cash. The vehicles will be sold for $50,000 cash. Midland has a security interest in the vehicles and machinery and equipment that secures its guaranteed debt. First Bank will extend the necessary credit to fund

---

[7] *See* Dkt. 96.

[8] Ex. 9

-6-

the cash purchases.[9] Midland specifically objects to the sale of the machinery, equipment, and vehicles on a number of grounds.

We now turn to the circumstances leading up to proposed Sale No. 1. In 2010, Kanza asserted its right to act as lead lender under the Midland participation and foreclosed. To resolve the foreclosure, the Lang entities sold an affiliated entity, McKinley Hardwood, at a substantial loss, leaving Midland with a substantial deficiency, but also temporarily resolving the foreclosure which Kanza dismissed. In 2011, Cabinet sold most of its assets. The building at 302 E. Dean in Burrton brought $1.0 million. The machinery and equipment was sold via online auction, the results of which were disappointing, again leaving Midland short. Cabinet, which had operated at a loss since its inception in 2006, closed its doors.

In 2012, the debtors entered into a workout agreement with Midland and First Bank that allowed them to pay interest-only on their debts for a brief time. But in 2013, the debtors were again unable to service their principal debt and requested further forbearance. Kanza refused, causing Midland, as lead lender to encourage the Lang entities to seek other lenders. The debtors sought financing from several area lenders and considered selling the companies. They also sought outside investment. They received offers of financing from two banks in Wichita and Newton as well as a

---

[9] The original motion to sell included the real estate at 115 E. Reno. Dkt. 75. After Midland objected to the sale, the debtors amended their notice of sale and removed that tract. Dkt. 96.

new proposal from First Bank.[10] They held an informal creditors' meeting in May of 2013 that included Midland, First Bank, the Kansas Department of Commerce, and the USDA. Kanza opted not to participate and again foreclosed. The debtors responded by filing these chapter 11 cases on July 26, 2013.[11] Shortly after the filings, Steve Lang formed HWM, Inc. to acquire the assets subject to this sale with the intention of seeking another lender to finance the acquisition and satisfy the Midland loan.[12]

Less than two months later, on September 16, 2013, the debtors filed their initial sale motion, drawing an immediate objection from Midland who says that the contemplated sale by these debtors to a new entity formed and owned by the debtors' ownership was not negotiated at arm's length, is not in good faith, and is for insufficient consideration.[13] Under Midland's and USDA's guaranty agreement, Midland has a variety of servicing duties to the Government and cannot unilaterally agree to the sale because it is to Steve Lang's newly formed company. As a matter of policy, the USDA does not fund insiders' acquiring assets from affiliates. Exceptions to this policy must be obtained from the Administrator of the Rural Business-Cooperative Service, a division of that agency.[14] In response to this objection, the

---

[10] Ex. 3, 4, and 5.

[11] Ex. 18, Foreclosure petition filed June 7, 2013.

[12] See Ex. V, Articles of Incorporation of HWM, Inc., dated August 20, 2013.

[13] Dkt. 74 (Amended Asset Purchase Agreement), 75 (sale motion), 86 (sale motion addendum), and 83 (Midland objection).

[14] Ex. U.

debtors filed a motion asking the court to "denominate the U.S. Department of Agriculture as a Party in Interest" to which the government has objected.[15] That motion has been deferred pending the outcome of this sale motion.

An evidentiary hearing was held on November 20, 2013 and the parties offered closing arguments on November 25, 2013.[16] Shortly before the hearing, debtors and HWM filed their Amended Motion for Sale No. 1 and submitted a Second Amended Asset Purchase Agreement entered into on November 18, 2013.[17] This amendment deleted from proposed Sale No. 1, the 115 North Reno property mortgaged to Midland.

### *Good Faith and Sound Business Reasons*

The debtors pursued a number of avenues in their attempt to preserve the core business and its highly-skilled employees. These included obtaining several loan proposals, including First Bank's commitment to lend and attempts to secure outside investment. Lang and Bowman dealt openly with all of the creditors concerned, even convening a creditors meeting with them and including them in the negotiation process and terms of the proposed sale. Both Midland's and First Bank's presidents stated that the lending relationship with the companies had been cordial and cooperative.

Steve Lang stated that he hadn't considered selling what remained of the

---

[15] Dkt. 46, 63.

[16] The debtor Lang entities appeared by their counsel Edward J. Nazar. Midland Bank appeared by its attorney David Burns. First Bank of Newton appeared by its attorney Timothy Hodge.

[17] Dkt. 96, 103.

business because he was concerned about a possible poor return. When he sold the 302 East Dean property as part of the 2011 workout after the first Kanza foreclosure, it was the first such building to sell in Burrton in 10 years. The results of the online equipment auction the debtors conducted as part of that workout were acutely disappointing. The debtors received roughly ten cents on the dollar.[18] Lang believes that selling the business would not serve the lenders well and would be harmful to the business, the community, and, of course, his experienced and loyal employees. He considers that the likely prospective purchasers in such a sale would be his competitors who survived the 2009 collapse.[19] He points out that those competitors don't need the equipment or real estate, rather they seek debtors' customers. Such a sale is likely to result in Burrton losing an employer and 25 skilled employees losing their jobs. Lang believes that his 12-year borrowing relationship with First Bank makes the HWM sale the best option for all concerned. While the operating margin is thin, HWM is capable of cash-flowing.[20]

Ms. Bowman, who is a certified public accountant, agreed that what First Bank is prepared to lend and Steve Lang is prepared to pay exceeds what any outsider might pay for the equipment and land. She and First Bank's president stressed that the

---

[18] For that auction, Midland and the USDA approved minimum bids.

[19] Midland's equipment valuation expert Dan Bashaw estimated that 80% of the woodworking industry market "went under."

[20] Ex. 19. Under Bowman's cash-flow analysis, the business would generate a monthly margin of approximately $1,900, but would be able to make the principal and interest loan payments for the first time in several years.

-10-

Bank's offer to finance had a short deadline, creating time pressure in completing this transaction. Adding to that pressure is the ongoing push-back the company receives from its customers and the competitive disadvantage that being in bankruptcy presents. A further source of concern is the looming expiration of a state tax exemption in January of 2014. All of these factors militate against the debtor taking the time that filing and confirming a plan and disclosure statement might take.

### *Value of machinery, equipment and vehicles*

Midland's principal factual dispute centers on the value of the line of machinery and equipment to be acquired by HWM. Both WKL and Midland presented value testimony at the hearing on this motion. The debtors relied on the appraisal report of Duckwall & Company, Inc. Daniel Duckwall inspected some, but not all, of the equipment at Burrton shortly before the hearing. He is certified as compliant with USPAP[21] and works as an auctioneer and appraiser of industrial equipment and machinery. He presented a written report that included photographs of some of the larger items.[22]

Duckwall testified that the fair market value of the equipment to be sold to HWM is $474,610. In that report, he defines "fair market value" as what a willing buyer would pay a willing seller, not under compulsion, and with full knowledge of

---

[21] The Uniform Standards of Professional Appraisal Practice are the generally accepted standards for professional appraisal practice in North America, as developed by the Appraisal Standards Board of the Appraisal Foundation. *See* www.appraisalinstitute.org/ppc/ethics_standards.aspx on December 5, 2013.

[22] Ex. 7.

what is being sold. Duckwall also testified that, at liquidation, this equipment would be worth not more than $278,325.[23] Duckwall's fair market valuation assumed that the goods would be exposed to the market in place at Burrton for as long as six months. His liquidation value opinion assumed that the equipment would be sold over a period not to exceed 90 days. He suggested that the equipment being in Burrton, Kansas might depress its value, but that the greatest single factor depressing its value is the significant increase in competition in the domestic and international cabinet business. He also noted that woodworking equipment auctions that he has recently observed have not been well attended.

On cross examination, Midland established that Duckwall's appraisal did not include a few items of property, most notably several forklifts and a table saw. These items, taken together at Bashaw's values, amount to $28,810.[24] But, as noted below, these are retail, not fair market, values. The other discrepancies are explained by Duckwall's grouping various related component items together, rather than listing them by line item. Adding the missing components at Bashaw's values increases the total fair market value of the equipment to $493,420.

Midland relied on the valuation testimony of Dan Bashaw of Overland Tool and Machinery. While Bashaw did not state that he was a certified appraiser, his business is the onsite sale and brokerage of equipment. Indeed, some of the debtors' equipment

---

[23] Ex. 8.

[24] See Ex. W, lines 103, 104, 118 and at top of page 4.

was purchased from Overland. He has performed valuation services from time to time and bases his opinions upon information he accumulates in his business and on his 36 years in the equipment sales business. Bashaw did not supply a typical expert report. Instead, he testified from a spreadsheet inventory of equipment based on lists he received from Lang and Bowman with values attributed to each line item.[25] Bashaw opined that the value of the equipment where it is located and if well-maintained in a safe environment is $777,811. He based that opinion on his experience as a dealer and broker. His pricing is based on information available to Overland through trade group member databases. His value opinion assumes a transaction between an unrelated buyer and seller after exposing to the market for between a few weeks and a number of months. If Bashaw were to buy all of this equipment in a lot, he would expect to receive a 10% discount. He admitted that it would be difficult to obtain fair market value for this equipment if it were sold piecemeal. Bashaw considers himself a retail dealer. He admitted that his approach to valuing the equipment was affected by that perspective.[26]

Bashaw also testified that the liquidation value of the equipment is $466,000, though, on cross examination, he stated that he would only pay $350,000 for all of it if he were buying it for resale. He also noted that he would liquidate the equipment by

---

[25] Ex. W.

[26] Bashaw estimated that 95% of Overland's business is retail and a very small percentage (less than 8%) of Overland's inventory is comprised of used equipment.

Case 13-11934    Doc# 115    Filed 12/11/13    Page 13 of 23

selling it at a dispersal auction as opposed to selling it as a package. He conceded that he typically sells new equipment and that what he sells used he acquires via trading or purchases for resale. He noted, too, that there are valuation resources for equipment, but he did not cite to any in his testimony.

I credit Mr. Bashaw's experience in the field, but note that he is, in fact, a retailer whose opinion was not based on auction or liquidation experience. Nor was it based on any comparative sales information. By contrast, Mr. Duckwall's testimony was based on his experiences as an auctioneer and appraiser of industrial equipment with significant experience in appraising and selling woodworking tools. Given the wide range in values testified to at trial, from Duckwall's liquidation value of $278,000 to Bashaw's fair market value of $778,000, and given the two witnesses' agreement that the market for this equipment is challenged at best, I conclude that Mr. Duckwall's report, as modified by the few pieces of equipment he appears to have missed, better reflects the fair market value of this equipment where it is situated today. I accordingly find that the fair market value of the equipment offered for sale in the motion is not less than $474,610 and not more than $493,420 if full credit at Bashaw's values of the omitted pieces is added to Duckwall's value. I also find that its liquidation value does not exceed $350,000, the amount that Bashaw said he would pay if he were to purchase all of it for resale.

### *Analysis*

#### *Section 363(b) Sales in General*

As debtors in possession, the debtors in this case may sell estate assets outside

the ordinary course of business under § 363(b) after notice and a hearing. Case law and practice have developed a set of standards for determining whether a proposed sale may be approved under subsection (b).

> The Debtor must show (1) that a sound business reason exists for the sale; (2) there has been adequate and reasonable notice to interested parties, including full disclosure of the sale terms and the Debtor's relationship with the buyer; (3) that the sale price is fair and reasonable; and (4) that the proposed buyer is proceeding in good faith.[27]

Turning first to the basic sale approval factors, there are sound business reasons to proceed as the debtors have requested.[28] This business cannot long languish in chapter 11 and remain viable. If, however, the principals are permitted to convey its assets to a new entity that is financed by a willing lender on reasonable terms, and if all parties will receive something akin to what they would get in a conventional chapter 11 plan, there is no reason not to permit a sale, assuming the proposal meets the other terms and provisions of § 363. The risks of waiting for a plan to be confirmed include (1) that the debtors' tax exemptions and deferral of principal payments will soon expire; (2) that 25 highly skilled people will lose their jobs; (3) that uncertainty about the enterprise's future has become a tool for its competitors to use against it in the marketplace; and (4) that an ongoing business in a very small town will collapse. Considering the efforts the debtors' management has made to resolve the debts outside

---

[27] *In re Medical Software Solutions*, 286 B.R. 431, 439-40 (Bankr. D. Utah 2002).

[28] There were no objections to the sufficiency of notice here, nor does anyone allege that the sale terms and the debtors' relationship with the buyer were not fully disclosed.

of bankruptcy and to secure replacement financing, the debtors have exercised sound management practices in trying to move the business to safe ground in the most expeditious way.

The third and fourth general sale factors are whether the price is fair and reasonable and whether the buyer has acted in good faith. These factors overlap. Again, case law provides the controlling standard. In the Tenth Circuit, courts have long held that a sale is in good faith if the price received is 75% of the appraised value of the assets.[29] Following the Tenth Circuit's *Bel Air* decision, the Bankruptcy Appellate Panel has recently reaffirmed that "[i]n order to obtain good faith status under § 363(m), a purchaser must (i) buy the property without "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" and (ii) pay "at least 75% of the appraised value of the assets."[30]

I have concluded that the fair market value of the machinery and equipment to be sold under this agreement is not more than $493,420. Seventy-five percent of that amount is $370,065. Lang testified that the Bank was prepared to lend up to $410,000 to consummate the sale of the equipment line. The debtors orally amended their motion to sell to reflect an increased offer by HWM in that amount. Under Tenth

---

[29] *Tompkins v. Frey (In re Bel Air Assocs., Ltd.)*, 706 F. 2d 301, 305 n. 12 (10th Cir. 1983), citing *Greylock Glen Corp. v. Community Sav. Bank*, 656 F. 2d 1, 4 (1st Cir. 1981) and *In re Rock Indus. Machinery Corp.,* 572 F. 2d 1195, 1197 n.1 (7th Cir 1978).

[30] *In re Crowder,* 314 B.R. 445, 450 (10th Cir. B.A.P. 2004).

-16-

Circuit authority, that amount is more than sufficient to support a finding that the sale is for a fair and reasonable price and in good faith.

Good faith in this context is based not only on the adequacy of proposed sale price, but also on whether the purchaser bought "without fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."[31] When the purchaser at the proposed sale is an insider of the debtor, heightened scrutiny of the circumstances is required.[32] While sales to fiduciaries are not per se prohibited, they should be carefully examined for fraud or collusion. After hearing the testimony of the debtors' principal owner, the debtors' chief financial officer, and Ray Penner, president of First Bank, I am comfortable that no fraud or collusion informs this transaction. Lang has openly interacted with his lenders and other creditors throughout the case. The terms and provisions of the sale as well as his involvement in it have been fully disclosed. While he may benefit from its approval, his intentions to continue to operate the business and employ residents of a small country town belie any assertion of misconduct on his part. The sale was legally and appropriately noticed and no other bidders have cropped up. I cannot conclude that Lang or the trusts are taking unfair advantage of other participants in the marketplace.[33] Moreover, preserving established businesses in small agrarian

---

[31] *Id. See also In re Bel Air Assocs., Ltd.*, 706 F.2d at 305 nn. 11–12.

[32] *In re Medical Software Solutions*, 286 B.R. at 445; *In re Bidermann Inds., Inc.*, 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1997);

[33] *See In re Condere Corp.*, 228 B.R. 615, 631-32 (Bankr. S.D. Miss. 1998).

-17-

communities is entirely consistent with the overarching goals and policies of the USDA Rural Development programs.[34]

When a pre-plan sale is proposed in a chapter 11, courts often refer to the "Lionel Factors" to determine whether such a sale comports with sound business judgment and is appropriate. Those factors include:

> (1) the proportionate value of the asset to the estate as a whole; (2) the amount of elapsed time since the filing; (3) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (4) the effect of the proposed disposition on the future plans of reorganization; (5) the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property; (6) which of the alternatives of use, sale or lease the proposal envisions; and *(7) most importantly perhaps, whether the asset is increasing or decreasing in value.*[35]

Applying the *Lionel* factors here, those that weigh against permitting the sale to go forward are outweighed by those that condone it. The short time between filing and the sale and the fact that this machinery and equipment are among the last saleable assets from which Midland can expect to realize on its security interest weigh against approval of the proposed sale. And, as Midland points out, a future reorganization of the remaining debtor assets seems unlikely once this sale is

---

[34] *See* www.rurdev.usda.gov/BCP_gar.html on December 6, 2013, describing the purpose of the Business and Industry Guaranteed Loan Program "to improve, develop, or finance business, industry and employment and improve the economic and environmental climate in rural communities." *See also* www.rurdev.usda.gov/Business.html on December 6, 2013, for the articulated mission of the USDA Rural Development.

[35] *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2nd Cir. 1983) (enumeration and emphasis added).

complete.[36] But the likelihood that this business will survive long enough to make it through the confirmation process is low. The property will be sold for a large proportion of its value compared to appraisals. The business is deteriorating and the current proposed lender may well back out if forced await the outcome of confirmation hearing. The most important *Lionel* factor, whether the assets are increasing or decreasing in value, weighs in favor of the proposed sale. Both valuation witnesses noted the lack of a favorable market to sell the equipment as a lot and agreed that a piecemeal sale would lower its value.[37] On balance, the *Lionel* factors weigh in favor of permitting the proposed pre-plan sale.

### Section 363(f): Sales Free and Clear of Interests in Property.

Section 363(f) of the Code permits § 363(b) sales of property to be free and clear of liens and interests in the property. Subsection (f)(1)-(5) sets out five conditions for sales free and clear. Because those conditions are listed in the disjunctive, satisfying any one of them is all that is necessary for the trustee or a debtor in possession to sell free and clear, so long as the other elements of § 363 are met. Midland argues that the debtors' proposed sale does not meet any of the subsection (f) criteria and relies primarily on subsections (f)(2) and (f)(3). Subsection 363(f)(2) requires that the secured

---

[36] The 115 N. Reno property that was removed from proposed Sale No. 1 by the amended sale motion will be the debtors only remaining asset. Its future separate sale is contemplated and Lang has offered to assist Midland to sell the Reno property.

[37] The debtors' experience when they sold the Cabinet equipment in October of 2011 undoubtedly lends credence to debtors' view that the equipment in Sale No. 1 is more likely decreasing in value.

-19-

creditor consent to the sale and Midland refuses to do that. Subsection 363(f)(3), requires that the sale be for not less than an amount greater than the "aggregate value of all liens."

The courts are somewhat divided on the meaning of § 363(f)(3). Most courts have concluded that the "aggregate value" of the liens is equal to or not greater than the value of the collateral being sold. But one court disagrees. In *Clear Channel Outdoor, Inc.*, the Ninth Circuit Bankruptcy Appellate Panel held that the price of the property sold must be greater than the aggregate amount of all *claims* held by the lienholders and rejected the view that the statutory language refers to the economic value of the liens, *i.e.*, the value of the collateral.[38] No court of appeal has adopted this view and the great weight of lower court authority is to the contrary. Most courts reason that if § 363 sales had to generate proceeds in excess of all of the claims that attached to the assets sold, few, if any of them would ever be approved.[39] This is the better view. Nevertheless, this sale does not meet (f)(3) under either view, because the fair market value of the property to be sold exceeds the actual sales price. While meeting the 75% good faith threshold may suffice to gain a sale's approval under § 363(b), it does not stretch to § (f)(3).

The proposed sale meets the requirement of subsection (f)(5). This subsection allows the property to be sold free and clear of an entity's lien if "such entity could be

---

[38] *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 41 (9th Cir. B.A.P. 2008).

[39] *In re Boston Generating, LLC*, 440 B.R. 302, 323 (Bankr. S.D.N.Y. 2010).

Case 13-11934    Doc# 115    Filed 12/11/13    Page 20 of 23

compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."[40] Midland's "interest" is an Article Nine security interest in personal property that, outside of bankruptcy, could be enforced by self-help or foreclosed in a court of appropriate jurisdiction.[41] Midland could be compelled to accept less than payment in full of the debt in a state law foreclosure and, to the extent the proceeds of the foreclosure sale were insufficient to pay the claims in full, Midland would receive an unsecured deficiency or, if it wished, Midland could credit-bid up to the amount of its claim under at the foreclosure sale. Here, Midland had the right to credit-bid up to the amount of its claim under § 363(k).[42] Midland chose not to do that.

Were these debtors to attempt to cram Midland down in a chapter 11 plan, § 1129(b)(2)(B) would permit them to pay Midland a stream of payments with a present value equal to the value of Midland's collateral and the balance of Midland's claim, at least as to the machinery, would be unsecured.[43] Several courts have held that "[b]y its express terms, Section 363(f)(5) permits lien extinguishment if the trustee can demonstrate the existence of another legal mechanism by which a lien could be

---

[40] 11 U.S.C.A. § 363(f)(5). *See In re Gulf States Steel, Inc. of Alabama,* 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002) (Section 363(f)(5) refers to a legal or equitable proceeding "in which the nondebtor could be compelled to take less than the value of the claim secured by the interest;" it requires a showing that some mechanism exists to address extinguishing the lien without paying in full).

[41] *See Clear Channel Outdoor, Inc.,* 391 B.R. at 42 (The term "interest" in subsection (f)(5) includes a lien.)

[42] *Boston Generating, LLC*, 440 B.R. at 323.

[43] *Scherer v. Fed. Nat'l Mortgage Assoc. (In re Terrace Chalet Apartments, Ltd.)*, 159 B.R. 821, 829-30 (N.D.Ill.1993).

extinguished without full satisfaction of the secured debt. Section 1129(b)(2) cram down is such a provision."[44] Midland could be crammed down and, therefore, compelled to accept a money satisfaction of its lien.[45] Therefore, the proposed Sale No. 1 satisfies § 363(f)(5) and may be approved as a sale free and clear of liens.

### Conclusion

The proposed sale free and clear of liens noticed by the debtors in their Amended Notice for Sale No. 1 (dkt. 96) and as orally amended at the hearing to increase the price offered for the equipment to $410,000 meets the requirements of § 363(b) and (f)(5) and is approved. Midland did not exercise its right to credit bid. Its objections are OVERRULED and the debtors' Motion for Sale No. 1, as amended and modified herein, is GRANTED. The debtors may sell the property that secures Midland's claim to HWM

---

[44] *Id.* at 829. *See also Compass Bank v. Investment Co. of the Southwest, Inc. (In re Investment Co. of the Southwest, Inc.),* 302 B.R. 112 (unpublished table decision) (10th Cir. B.A.P. Dec. 8, 2003) (recognizing chapter 11 cram down as a legal or equitable proceeding under § 363(f)(5), citing Collier's bankruptcy treatise); *In re Healthco Intern., Inc.,* 174 B.R. 174 (Bankr. D. Mass. 1994) (hypothetical chapter 11 plan cramdown qualified as money satisfaction of taxing authority's interest within meaning of § 363(f)(5)). *But see Clear Channel Outdoor, Inc.,* 391 B.R. at 45-6 (Holding that § 1129(b)(2) cramdown is not a legal or equitable proceeding under this section; if Code provided elsewhere for money satisfaction, there would be no need for § 363(f)(5)).

[45] *See also, In re Jolan, Inc.,* 403 B.R. 866, 869-70 (Bankr. W.D. Wash. 2009) where the bankruptcy court identified a number of legal or equitable proceedings in the State of Washington where a lienholder's interest could be cleared: its Uniform Commercial Code Article 9 default remedies permitting a senior secured party to dispose of collateral, a receiver's authority to sell free and clear, a personal property tax sale, a federal tax lien sale, and judicial and nonjudicial foreclosure sales.

-22-

and the lien of Midland will attach to the proceeds of that sale in the hands of the debtors.

### #